JOHN DOE and JAMES DOE

Plaintiffs,

– Versus –

BOBBY JINDAL, Governor of Louisiana, in his official and individual capacities; JAMES D. CALDWELL, Attorney General of Louisiana, in his official and individual capacities; JAMES M. LeBLANC, Secretary, Louisiana Department of Public Safety and Corrections, in his official and individual capacities; HILLAR C. MOORE, III, District Attorney for East Baton Rouge Parish, in his official and individual capacities; JOHN PHILLIP HANEY, District Attorney for Iberia, St. Martin and St. Mary Parishes, in his official and individual capacities;

Defendants.

NUMBER: 3:11-CV-554

JUDGE: Hon. Brian A. Jackson

M. JUDGE: Hon. Stephen C. Riedlinger

CIVIL RIGHTS ACTION
42 U.S.C. § 1983

DECLARATORY AND INJUNCTIVE RELIEF

RE: UNCONSTITUTIONALITY OF STATE CRIMINAL STATUTE

## PLAINTIFFS' PRETRIAL MEMORANDUM

## I.   INTRODUCTION

### The Parties

Plaintiff John Doe is a resident of East Baton Rouge Parish, Louisiana, a disabled veteran of the United States armed forces, a compliance officer and computer technician at a Louisiana company, an active member of his church, a board member of a local nonprofit that helps paroled prisoners transition to civilian life, a political blogger, a community volunteer and a Veterans Association member. He is also a registered sex

1

offender[1].  He seeks injunctive and declaratory relief from this Court barring Defendants from enforcing or applying La R.S. §14:91.5, which establishes the felony of "unlawful use or access of social media" by certain registered sex offenders, and which would substantially undo what, to date, has been his exemplary effort to rehabilitate himself and reintegrate into society.  For more information about John Doe, see the affidavit to be filed under seal upon entry of the protective order.

### James Doe

James Doe is a resident of Iberia Parish, Louisiana.  He works in a dangerous and highly specialized area of the petroleum industry.  His work takes him away from home for long stretches of time, during which he depends largely upon the internet to communicate with friends and family, and to obtain up-to-date technical and safety information about his field.  James is also a registered sex offender.[2]  The total ban on internet access imposed by §14:91.5 has severely impaired his ability to do both of those things.  For more information about James Doe, see the affidavit to be filed under seal upon entry of the protective order.

## II.    ARGUMENT

### A.  Summary

La R.S. §14:91.5 retroactively increases internet use or access restrictions on registered sex offenders who were previously convicted under R.S. §14:81 (indecent

---

[1]    In 2002, Plaintiff was convicted of possessing child pornography under La R.S. §14:81.1.  He served four years in prison and was released in 2006.  Upon his release, he properly registered with the Louisiana sex offender database.

[2]    Almost twenty years ago, while living in another state, James had a consensual sexual encounter with an underage person and pleaded guilty to an appropriate charge.  He served several years in prison and, after completing his parole and probation requirements, eventually relocated to Louisiana and registered as a sex offender here.  Even though James' offense had nothing to do with the internet or computers, he is subject to the proscriptions of §14:91.5 because his offense involved a minor.

2

behavior with juveniles), R.S. §14:81.1 (pornography involving juveniles), R.S. §14:81.3 (computer aided solicitation of a minor), or R.S. §14:283 (video voyeurism), or were previously convicted of a "sex offense" under R.S. §15:541 (defining "sex offense") in which the victim of the sex offense was a minor. La R.S. §14:91.55. The new law prohibits registrants from using or accessing social networking websites, chat rooms and peer-to-peer networks, but does not define "use," "access" or other critical terms, and defines "social networking website," "chatroom" and "peer-to-peer network" so broadly as to render unlawful virtually all internet access by affected registrants. It therefore is facially overbroad, and violates both the First Amendment, which guarantees the right not only to communicate information and ideas, but also to receive them, and the Due Process clause of the Fourteenth Amendment, which protects the public from vague criminal statutes. Furthermore, the statute does not meet procedural due process standards under the Fourteenth Amendment. Plaintiffs will address each point in turn.

**B.      §14:91.5 is facially overbroad**

**1.      Overbreadth generally**

§14:91.5 is facially overbroad because it substantially criminalizes protected speech beyond whatever criminal activity it purports to restrict.

The First Amendment protects the rights of individuals not only to express themselves, but also to receive "information and ideas, regardless of their social worth." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969). When a law "prohibits a substantial amount of protected speech [,] not only in an absolute sense but also relative to the statute's plainly legitimate sweep," it violates the First Amendment. United States v. Williams, 535 U.S. 285, 292, 128 S. Ct. 1830, 1838,

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 3 of 26

170 L. Ed. 2d 650 (2008); Hill v. City of Houston, Tex., 764 F.2d 1156, 1161 (5th Cir. 1985). "An overbroad statute is invalid on its face, not merely as applied, and cannot be enforced until it is either re-drafted or construed more narrowly by a properly authorized court." Ibid.

To be sure, a declaration of overbreadth is "strong medicine" applied "sparingly and only as a last resort," Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). The overbreadth of the statute "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615. However, where a statute's deterrent effect on legitimate expression is both "real and substantial," it must be invalidated. Erznoznik v. City of Jacksonville, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

"[I]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." City of Houston, Texas v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

Here, the question of whether §14:91.5 prohibits a substantial amount of protected conduct is easily answered in the affirmative. The key portion of the statute – its "definitions" section, reads as follows:

> (1)  "Chat room" means any Internet website through which users have the ability to communicate via text and which allows messages to be visible to all other users or to a designated segment of all other users.
> . . .
>
> (3)  "Peer-to-peer network" means a connection of computer systems whereby files are shared directly between the systems on a network without the need of a central server.

4

(4)    "Social networking website" means an Internet website that has any of the following capabilities:

    (a)    Allows users to create web pages or profiles about themselves that are available to the general public or to any other users.

    (b)    Offers a mechanism for communication among users, such as a forum, chat room, electronic mail, or instant messaging.

By incorporating such general terms, the statute proscribes almost all internet access and criminalizes even accidental navigation to a qualifying website.

### a.    "Use" or "Access"

§14:91.5 does not have an intent requirement, and operates to bar an affected registrant's mere navigation to a qualifying website. It does not require a registrant to actually upload content to a qualifying site, create a profile on a site or communicate with other users; rather, the offense is complete the moment a registrant navigates to page that would **allow** such things, even if that navigation is by accident, **even if the registrant has no idea that the website is one that could qualify** under the statute.

This outlandish restriction that criminalizes and makes punishable by five years in prison Plaintiffs' simple navigation of the internet is an impermissibly overbroad measure and should not be permitted to stand.

### b.    Prohibited content

Plaintiffs agree that under the plain language of the statute, use or access of Facebook and Myspace, two communities significantly populated by minors, indeed is barred. However, under even a narrow interpretation of the same language, Plaintiffs face broader restrictions that have nothing to do with child safety or prevention of crime: John Doe cannot lawfully access his online Veterans Association profile, his political

5

blog or the internet resources he uses to do his job. James Doe can no longer lawfully access technical databases or the bulletin boards upon which he depends for critical safety information about his profession. And while both are barred from using their web-based email accounts to contact friends and family, those restrictions are only the beginning.

Plaintiffs are barred from using or accessing Twitter, Craigslist, YouTube, eBay, Amazon, Yahoo, Hotmail and AOL, because such websites, in the language of §14:91.5, "Offer a mechanism for communication among users, such as a forum, chat room, electronic mail, or instant messaging."

Plaintiffs are **barred from appearing pro se in any action filed in federal court**, because the court's ECF system offers a similar mechanism for communication.

If Plaintiffs were to navigate to any website that allows users to offer product ratings or reviews, or if they were to check restaurant, movie or book reviews posted by other internet users, they would complete a felony requiring five years' hard labor. If they were to search for job opportunities on Hotjobs.com, Careerbuilder.com, LinkedIn, Monster, Indeed.com or USAJOBS.gov – the federal government's own employment database – they could be sent to prison, because such websites not only allow users to communicate via text, they also "Allo[w] users to create web pages or profiles about themselves that are available to the general public or to any other users." §14:91.5(C)(4)(a).

The simple act of navigating to any website that allows user comments or news sharing[3] is a felony for Plaintiffs, meaning that they are not be permitted to read the news at theadvocate.com, NOLA.com, www.bestofneworleans.com (the Gambit), CNN.com, MSNBC.com, FoxNews.com, Huffingtonpost.com, Slate.com, Wired.com, ESPN.com, BBC.com or Reuters.com. Browsing the online editions of the New York Times, Time Magazine, Newsweek, U.S. News & World Report, The Atlantic Monthly, The Economist, The New Republic, National Geographic, Dog Fancy, Mad Magazine or Good Housekeeping would qualify them for five years' or more imprisonment, as each of those websites permits communication via text between users in such a way that allows messages to be seen by others, or incorporates a mechanism for communication by text among users.

In total, §14:91.5 operates to keep Plaintiffs off the entire internet. Given that, the Court should see the statute for what it is: an attempt by the state to solve with a blunt instrument an alleged problem that demands, if even anything at all, the careful application of a scalpel. It should not permit such a careless abridgement of Plaintiffs' First Amendment rights.

### 2. Broad internet restrictions of convicted criminals

Defendants may argue that the broad restrictions of §14:91.5 are justified by the nature of Plaintiffs' crimes. However, that is not the case. First, such restrictions are generally imposed only as conditions of supervised release. See cases, *infra*. **This is not a supervised release case**, as neither defendant is serving probation or parole.

---

[3]     Nearly every news website on the internet permits users to forward stories to friends via email, Facebook, Twitter, Google+, Reddit, StumbleUpon, Digg and others. Most sites also allow comments, which appear at the bottom of each news story and are visible to all other users.

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 7 of 26

Therefore, the diminished protection afforded First Amendment liberties under supervised release conditions is not so diminished here.

Second, even when imposed as a condition of supervised release, a limit on otherwise protected First Amendment rights may be only as restrictive as reasonably necessary to achieve the state's goals of rehabilitation and prevention of crime. United States v. Peterson, 248 F.3d 79, 84 (2nd Cir. 2001), citing 18 U.S.C. § 3583 (conditions of a supervised release must be reasonably related to the factors set forth in the federal sentencing guidelines and "involve no greater deprivation of liberty than is reasonably necessary" to protect the public, and deter future criminal conduct).

In Peterson, the Second Circuit vacated a bank larceny sentence that barred as a parole condition defendants' **possession or use** of a computer that included, among other things, either a modem or internet access. Id. at 83. The court noted that "Computers and internet access have become virtually indispensable in the modern world of communications and information gathering. The fact that a computer with Internet access offers the possibility of abusive use for illegitimate purposes does not, at least in this case, justify so broad a prohibition." Ibid.

Similarly, in United States v. White, 244 F.3d 1199 (10th Cir. 2001), the Tenth Circuit reviewed a defendant's sentence for possession of child pornography, where one of the defendants' parole conditions was a computer restriction that arguably "would bar [defendant] from using a computer at a library to do any research, get a weather forecast, or read a newspaper online." Id. at 1206. The court held that the parole condition as written was overly broad and "neither reasoned nor reasonable" and remanded the matter to the district court for clarification of the language of the sentence. Id. at 1207. See also

8

United States v. Sofsky, 287 F.3d 122, 126 (2nd Cir. 2002) (rejecting an internet ban because its bar on e-mail, online research or reading a web-based newspaper inflicted greater deprivation of liberty than reasonably necessary); cf. United States v. Paul, 274 F.3d 155, 169-70 (5th Cir. 2001) (upholding an outright internet and computer ban as a condition of the supervised release of a repeat offender where (1) the offender's computer contained over 1200 images of child pornography, along with evidence that defendant had used the internet to access child pornography chat rooms, bulletin boards, and used e-mail to advise fellow consumers of child pornography on how to "scout" single, dysfunctional parents and gain access to their children; and (2) the defendant could not articulate a specific objection to the computer and internet ban "suggesting how his occupational affairs or his expressive activities will be adversely impacted by the fact that he will be unable to use a computer or the Internet").

Here, §14:91.5 imposes a broad internet use or access ban on all registrants convicted of the offenses enumerated in the statute, not simply those under conditions of supervised release, and not those for whom the internet was an instrumentality of the crime. This is an overly broad measure, both for John Doe, whose criminal history is nowhere near as egregious as the defendant's in U.S. v. Paul, and for James Doe, who committed a crime nearly twenty years ago that had nothing to do with either the internet or a computer. Given those facts, the Court should strike down §14:91.5 as unconstitutionally overbroad.

### C.    §14:91.5 is unconstitutionally vague

§14:91.5 is unconstitutionally vague because key terms are defined imprecisely or not at all. The lack of precision renders the law unintelligible to the public, unenforceable by police and prosecutors and uninterpretable by the judiciary.

It is a basic principle of due process that "an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). To avoid unconstitutional vagueness, a statute must fulfill two requirements: it must 1) be clear enough to provide a person of ordinary intelligence notice of what conduct is prohibited, and 2) provide standards for those who enforce its prohibitions." Ibid.

Under the first prong, "mathematical certainty" is not required, ibid., but where "...[p]eople of common intelligence must necessarily guess at the law's meaning and differ as to its application," it is unconstitutional. Citizens United v. Federal Election Commission, 130 S.Ct. 876, 889, 558 US 50, 175 L. Ed. 2d 753 (2010). Indeed, where a statute "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," it must be struck down. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

Under the second prong, the statute must provide law enforcement with a meaningful set of "**explicit** standards." Grayned, supra, 408 U.S. at 108 (emphasis added). If instead the law merely "encourages arbitrary and erratic arrests and convictions," Papachristou, supra, 405 U.S. at 162, it cannot stand. Moreover, where the statute places "unfettered discretion. . . in the hands of the [police]," id. at 168, or "furnishes a convenient tool for 'harsh and discriminatory enforcement by local

prosecuting officials, against particular groups deemed to merit their displeasure," id. at 170, it violates Fourteenth Amendment Due Process guarantees. As the Supreme Court noted in Grayned, supra, 408 U.S. at 108-109, a law is vague under the Fourteenth Amendment where it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

As to the first prong of the vagueness test, §14:91.5 does not define "use or access" at all, and, as discussed at length above, defines "social networking websites," "chatrooms" and "peer-to-peer networks" as follows:

> (1)  "Chat room" means any Internet website through which users have the ability to communicate via text and which allows messages to be visible to all other users or to a designated segment of all other users.
>
> . . .
>
> (3)  "Peer-to-peer network" means a connection of computer systems whereby files are shared directly between the systems on a network without the need of a central server.
>
> (4)  "Social networking website" means an Internet website that has any of the following capabilities:
>
> > (a)  Allows users to create web pages or profiles about themselves that are available to the general public or to any other users.
> >
> > (b)  Offers a mechanism for communication among users, such as a forum, chat room, electronic mail, or instant messaging.

Looking first at §14:91.5(C)(1), "chat room" is defined as any internet website "through which users have the ability to communicate via text," where such communications are "visible to all other users or to a designated segment of all other users." "Designated segment" is not defined; it is nothing more than an ambiguous term

11

that could refer to groups of users of any size, classified per any number of common attributes or variables. "User" is also not defined, but given the word's plain meaning, it could include anyone from the person who browses the site to the person who designs it.[4]

Turning to §14:91.5(C)(4), the definition of "social networking website" set forth at (4)(b) could be taken to include most of the internet. Millions of websites incorporate "mechanism[s] for communication" among users, whether that mechanism is as simple as a "comments" section or as complicated as a web-based email service, such as Yahoo or Gmail. Moreover, depending upon how one defines "user" (the statute does not define the term, but a "user" could reasonably include both site visitors and the people who design and post content to the page, who "communicate" with one another as site visitors browse the internet), almost all web content could be prohibited. At any rate, one thing is clear: persons of ordinary intelligence could reasonably disagree about what constitutes "use," "access," "designated segment," "communication via text," "mechanism for communication" and "user," and easily could come to different conclusions about exactly what online activities are prohibited.

As to the second prong of the vagueness test, §14:91.5 not only provides few, if any, cognizable standards for law enforcement, it will be almost impossible to enforce in an efficient, uniform manner, leaving registrants subject to the erratic and arbitrary decisions of parole and probation officers. Police will be left with the sort of "unfettered

---

[4]    Merriam-Webster defines "user" simply as "one who uses," and "internet" as "an electronic communications network that connects computer networks and organizational computer facilities around the world." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/internet, last visited August 10, 2011.

    Incidentally, "Using" Merriam-Webster.com would be a felony under the language of §14:91.5(C)(1) and (C)(4)(b), because underneath the displayed definition of each word is an interactive Facebook application that allows dictionary users to comment on the definition or the features of the site.

discretion" cautioned against by the Supreme Court in <u>Grayned</u> and <u>Papachristou</u> as to whether something is arrestable behavior; prosecutors will have unbridled liberty to determine what constitutes a prosecutable offense[5]; judges will disagree on what the elements of an offense are; and juries will be hard pressed to determine whether those elements have been met. For those reasons, the Court should declare §14:91.5 unconstitutionally vague.

### D. §14:91.5 violates the First Amendment

Apart from the First Amendment implications of Plaintiffs' overbreadth challenge, §14:91.5 is simply an unconstitutional restriction of Plaintiffs' rights to free speech and association.

### 1. §14:91.5 is a content-based restriction on protected speech

### a. First Amendment rights generally

Statutes that "restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." <u>Broadrick v. Oklahoma</u>, supra, 413 U.S. at 611-612. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. <u>Ashcroft v. American Civil Liberties Union</u>, 535 U.S. 564, 573 (2002). A speech regulation is content-based if it defines the regulated speech by reference to its content. <u>United States v. Playboy Entm't Group, Inc.</u>, 529 U.S. 803, 811, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Where a statute imposes a content-

---

[5]     The idea of prosecutorial restraint as a check against criminalization of otherwise protected First Amendment liberties was rejected by the Supreme Court in <u>U.S. v. Stevens</u>, 559 US ___, 130 S.Ct. 1577 (2010): "the First Amendment protects against the government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."

based restriction on otherwise protected speech, that statute will be subjected to strict scrutiny, meaning that in order to survive, the statute must be narrowly tailored to advance a compelling state interest. <u>Rangra v. Brown</u>, 566 F.3d 515 (5th Cir. 2009).

Courts also treat with great suspicion laws that, while arguably content neutral, "foreclose an entire medium of expression." <u>City of Ladue, et al., v. Gilleo</u>, 512 U.S. 43, 55, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). In that context, the Supreme Court has invalidated ordinances that prohibited: the distribution of pamphlets within a municipality, <u>Lovell v. Griffin</u>, 303 U.S. 444, 451-452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); the distribution of handbills on public streets, <u>Jamison v. Texas</u>, 318 U.S. 413, 416, 63 S.Ct. 669, 672, 87 L.Ed. 869 (1943); the door-to-door distribution of literature, <u>Martin v. Struthers</u>, 319 U.S. 141, 145-149, 63 S.Ct. 862, 864-866, 87 L.Ed. 1313 (1943); and live entertainment, <u>Schad v. Mount Ephraim</u>, 452 U.S. 61, 75-76, 101 S.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981). Even where prohibitions "foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." <u>City of Ladue</u>, supra.

Lastly, First Amendment jurisprudence pays even greater respect to speech that takes place within the privacy of one's own home. <u>Id.</u> at 58, noting that "respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to **speak** there." (emphasis in original), citing <u>Spence v. Washington</u>, 418 U.S. 405, 406, 409, 411, 94 S.Ct. 2727, 2728, 2729-2730, 41 L.Ed.2d 842 (1974). "Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination,

the danger they pose to the freedom of speech is readily apparent -- by eliminating a common means of speaking, such measures can suppress too much speech." Id. at 55. Such regulations are subject to a level of review higher than intermediate scrutiny. Id. at 56.

Here, §14:91.5 is a content-based restriction on protected speech because it bars Plaintiffs from using or accessing websites based upon the content of those websites, as that content is defined in the statute. Sites that that meet the content requirements set forth in the statute's definitions section – communication among users via text, user comments, profiles that are visible to all users or a designated segment of viewers, etc. – are restricted, while sites that do not contain such material (even though few such sites may exist) are allowed. That distinction operates as a content-based restriction on free speech, and it cannot be allowed to stand.

Moreover, there is no question that §14:91.5 forecloses an entire medium of speech. As briefed above at considerable length, the law restricts Plaintiffs' access to nearly the whole of the internet. It must be struck down.

### b.    The rights of convicted sex offenders who have completed their sentences

Courts are generally loathe to restrict the First Amendment rights of convicted sex offenders who, like Plaintiffs here, have served their sentences and are no longer on parole, probation or supervised release.

In United States v. White, supra, 244 F.3d at 1206, the Tenth Circuit ruled that "a complete, unconditional ban on internet access as a condition of supervised release is overly broad and impermissible," even for a repeat offender. It stands to reason, therefore, that such an unconditional ban where a person is no longer under supervised

release would be similarly impermissible. While there is a shortage of precedent directly on that point, courts that have addressed the issue have been reluctant to afford those persons not subject to supervised release or other restrictions anything less than full First Amendment protection.

In Doe v. Marion County, 566 F. Supp. 2d 862 (S.D. Ind. 2008), registered sex offenders who had completed their sentences challenged a law requiring them to submit to warrantless searches of their personal computer equipment. Id. at 865. The court held that people who "[h]ave completed their sentences and are no longer on parole, probation, or any other form of court supervision" were "entitled to full Fourth Amendment protection, without the lowered expectation of privacy" of supervised releasees. Id. at 865, 879. The court noted that because these offenders had completed their sentences and "returned to society," they "ha[d] rights under the United States Constitution." Id. at 866.

In Doe v. Shurtleff, No. 1:08-CV-64 TC, 2008 WL 4427594 (D. Utah Sept. 25, 2008), vacated as moot, 2009 WL 2601458 (D. Utah Aug. 20, 2009), vacation aff'd 628 F.3d 1217 (10th Cir., 2010)[6], a federal court in the North Division of the United States District of Utah enjoined enforcement of a Utah statute requiring registered sex offenders to turn over their internet identifiers to the state. The court relied upon, among other things, the Tenth Circuit's holding in White, *supra*, and noted the state's failure to "cite any authority supporting the proposition that a sex offender who has completed his prison term and is not on parole or probation gives up First Amendment rights." Id. at *19.

---

[6]     In Shurtleff, the court enjoined enforcement of a Utah statute requiring sex offenders to turn their online identities over to the state. In response, the Utah legislature amended the law to correct the constitutional violations, and the district court thereafter permitted enforcement. The Tenth Circuit subsequently rejected the defendant's constitutional challenge to the revised statute. Doe v. Shurtleff, 628 F.3d 1217, 1220 (10th Cir. 2010).

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 16 of 26

Most recently, in <u>Doe v. Nebraska</u>, 734 F. Supp. 2d 882, 896-97 (D. Neb. 2010), a federal district court reviewed the Nebraska Sex Offender Registration Act, including one provision requiring registered sex offenders to consent to warrantless searches of their computers. The court ruled that the search requirement was unconstitutional as applied to "persons who [were] not presently on probation, parole or court-monitored supervision" at the time of its enactment. Just like the district court in <u>Shurtleff</u>, the Nebraska court noted that the state had "cited no case" to support its position that a sex offender "who has completed his or her punishment and supervision for a sex crime was held to have a weaker claim to Fourth Amendment protection than ordinary citizens."

Here, Plaintiffs have completed their sentences, including all parole and probation requirements, yet §14:91.5 bars them from using or accessing the entire internet and forecloses their access to the one of the world's most widely-used methods of communication, solely to discourage behavior that is already criminalized elsewhere in Louisiana's laws. This Court should not let the State so broadly eclipse Plaintiff's rights; it should permanently enjoin enforcement of §14:91.5 and declare it an unconstitutional affront to the First Amendment.

## 2. In the alternative, §14:91.5 is an unconstitutional, content-neutral restriction on time, place or manner

As the Supreme Court noted in <u>City of Ladue</u>, supra, "Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a common means of speaking, such measures can suppress too much speech." <u>Id.</u> at 55. To guard against such suppression, the Court evaluates time, place or manner regulations using a four-part test: a content-neutral regulation of the time, place or manner of

otherwise protected speech will be upheld only if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968); J & B Entertainment, Inc. v. City of Jackson, Miss., 152 F.3d 362 (5th Cir. 1998). Of course, even when a regulation does not "foreclose an entire medium of expression, but merely shifts the time, place, or manner of its use," that regulation "must leave open ample alternative channels for communication." City of Ladue, supra, 512 U.S. at 56, citing Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

Here, Plaintiffs do not dispute Louisiana's constitutional authority, the importance of the state's interest in protecting its minors, or that its interest in passing §14:91.5 was public safety, not direct suppression of speech. Plaintiffs are certain, however, that the state's "incidental restriction" of their First Amendment rights extends far beyond what is necessary to further its interest in public safety, as that restriction forecloses Plaintiffs' access to the entire internet, including modes of communication – such as Plaintiffs' web-based email accounts, John Doe's Veterans Association profile or James Doe's safety and technical update service – that in no cognizable way implicate the safety of minors, and leaves Plaintiffs no meaningful alternative for the communication and receipt of information and ideas. For that reason, this Court should declare that §14:91.5 is unconstitutional under the First Amendment.

### 3. §14:91.5 also unlawfully restricts Plaintiffs' right to free expressive association

"The First Amendment protects the right of "expressive association" – that is, "the right to associate for the purpose of speaking." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 68 (2006). "[A]ssociations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." Boy Scouts of Am. v. Dale, 530 U.S. 640, 655 (2000).

Here, §14:91.5 makes it a felony for Plaintiffs to engage in online "social networking," and broadly defines social networking websites to include the internet pages of Facebook and MySpace, but also of the Veterans Association, the ACLU, the American Bar Association and countless others. The statute criminalizes any attempt by Plaintiffs to gather in the thousands of web-based chat rooms, bulletin board services or message boards where people congregate daily to discuss ideas and exchange opinions, even where those websites pose no threat to child safety or crime prevention. The statute therefore is an unconstitutional restriction on Plaintiffs' rights to expressive association, and must be struck down.

### E. §14:91.5 does not contain adequate procedural due process safeguards

The core guarantee of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Findeisen v. North East Independent School Dist., 749 F.2d 234 (5th Cir. 1984), citing Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

### a.    John Doe is not adequately protected

As to John Doe, §14:91.5 contains no such guarantees.  The procedure by which an affected registrant may seek an exception to the statute's proscriptions is ambiguously set forth in the following cursory statement:

> The use or access of social media shall not be considered unlawful for purposes of this Section if the offender has permission to use or access social networking websites, chat rooms, or peer-to-peer networks from his probation or parole officer or the court of original jurisdiction.
> §14:91.5(B)

The statute does not specify how a registrant is supposed to seek such permission from probation officers, parole officers or the court; it provides no option for a registrant to appeal an unfavorable decision of a probation or parole officer; and it provides no substantive standards by which probation officers, parole officers or courts must abide in determining whether a particular registrant is worthy of an exception, or even whether the communication for which an exception is sought would otherwise be prohibited by the statute.  It gives no guidance to courts in matters of interpretation or oversight, and leaves registrants subject to arbitrarily-exercised whims of local law enforcement, forcing them to ask permission of their parole and probation officers to engage in such constitutionally sacrosanct activities as reading a newspaper, participating in political debate or communicating with friends and family from the privacy of one's own home.

For John Doe, this means that in order to lawfully access any qualifying website, including his own political blog and his Veterans Administration profile, he must find a probation or parole officer (which he does not presently have) or return to court, ask permission and hope that (1) the judge understands the issues and (2) that the state does

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 20 of 26

not demand a contradictory hearing and challenge John Doe's application. Under the statute, he also has no recourse if the court's decision is unfavorable and, of course, is prohibited from communicating on the internet as the entire process plays out.

### b. James Doe is not protected at all

The state's failure to adequately set forth the manner in which an affected registrant may seek an exception to §14:91.5 is an egregious infringement upon John Doe's procedural due process rights. The state's infringement upon *James Doe's* procedural due process rights, however, is much worse.

As noted above, only three entities may grant an affected registrant an exception to §14:91.5: (1) the registrant's parole officer, (2) the registrant's probation officer, (3) or the court of original jurisdiction. Unfortunately for James Doe, he was tried, convicted and sentenced by the court of another state, and moved to Louisiana only after completing his parole and probation requirements. Like John Doe, James has no parole or probation officer here in Louisiana. Unlike John Doe, however, James Doe's court of original jurisdiction is in another state, more than 1,000 miles away and utterly lacking the authority to order the District Attorney of Iberia Parish, Louisiana not to prosecute someone with a felony. Simply put, **James Doe has no way out** from under §14:91.5.

### F. Plaintiffs will be irreparably harmed if this Court does not declare §14:91.5 Unconstitutional

The plain language of §14:91.5 will transform many of Plaintiffs' daily activities – emailing their friends and families, searching and retrieving information from the internet as necessary functions of their jobs, posting political commentary on their personal blogs – from acts of protected speech into felonies. This Court must not allow

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 21 of 26

such inartfully and incautiously drafted legislation to unnecessarily curtail Plaintiffs' First Amendment freedoms.

Courts have consistently held that denial of fundamental freedoms constitutes irreparable injury as a matter of law. "It has been repeatedly recognized by the federal courts that violation of constitutional rights constitutes irreparable injury as a matter of law." Springtree Apartments, ALPIC v. Livingston Parish Council, 207 F.Supp. 507, 515 (M.D. La. 2001). As the Supreme Court has noted, "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.' Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); see also Deerfield Medical Ctr. v. City of Deerfield Beach, 661 F.2d. 328 (5th Cir. 1981) ("we have already determined that the constitutional right of privacy is either threatened or is in fact being impaired and this conclusion mandates a finding of irreparable injury."); Killebrew v. City of Greenwood, 988 F.Supp. 1014, 1016 (N.D. Miss. 1997) ("Plaintiffs' claims are primarily based upon violation of their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, and thus, the threat of irreparable injury is present as a matter of law."); Murillo v. Musegades, 809 F.Supp. 487, 497 (W.D. Texas 1992) ("Irreparable injury is established upon movants showing constitutionally protected rights have been violated.'); Wiggins v. Stone, 570 F.Supp. 1451, 1453 (M.D. La. 1983) ("[I]t is well established that deprivation of a constitutionally protected right constitutes irreparable injury."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that no further showing or irreparable injury is necessary"). This reasoning essentially collapses

the "likelihood of success on the merits" and "irreparable harm" prongs of the injunctive inquiry into one test where fundamental rights are at stake.  Forum for Academic & Inst. Rights v. Rumsfeld, 390 F.3d 219, 246 (3d Cir. 2004).

Here, not only will Plaintiffs be substantially deprived of their First Amendment rights for the duration of their registrations as sex offenders, they also likely will suffer professional consequences.  John Doe may lose his job as a compliance manager and computer technician, as both of those positions require him to spend considerable time using internet search engines, sending email, accessing informational databases and communicating with other professionals online.  James Doe may be curtailed in his ability to perform his own job, and may even find his own personal safety at risk for lack of critical safety and technical information.  Given those facts, the Court should declare the statute unconstitutional under the Due Process Clause of the Fourteenth Amendment.

**G.  The injury to Plaintiffs' fundamental rights far outweighs any harm that will result if an injunction is granted.**

There are two reasons why the injury to Plaintiffs' First Amendment rights outweighs the harm, if any, that the state will suffer by a temporary restraining order barring enforcement of §14:91.5.  First, it is well settled that the State has no legitimate interest in enforcing an apparently unconstitutional statute, particularly where such enforcement would harm the protected First Amendment rights of its citizens.  American Civil Liberties Union v. Johnson, 194 F.3d 1149 (10th Cir., 1999) (upholding the district court's TRO and noting that "the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' ability to enforce what appears to be an unconstitutional statute.")

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 23 of 26

Second, a temporary restraining order will not harm the state or the people of Louisiana in any way, as the state has already criminalized the sort of conduct §14:91.5 presumably was enacted to prevent. La R.S. §14:81 criminalizes "indecent behavior with juveniles," including in an electronic context;[7] La R.S. §14:81.1 criminalizes child pornography;[8] La R.S. §14:81.1.1 makes "sexting" among minors a felony;[9] and lastly, La R.S. §14:81.3 criminalizes "computer-aided solicitation of a minor."[10]

---

[7] §81. Indecent behavior with juveniles

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

. . .

(2) The transmission, delivery or utterance of any textual, visual, written, or oral communication depicting lewd or lascivious conduct, text, words, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.

. . .

C. For purposes of this Section, "textual, visual, written, or oral communication" means any communication of any kind, whether electronic or otherwise, made through the use of the United States mail, any private carrier, personal courier, computer online service, Internet service, local bulletin board service, Internet chat room, electronic mail, online messaging service, or personal delivery or contact.

[8] §81.1. Pornography involving juveniles

A. (1) It shall be unlawful for a person to produce, distribute, possess, or possess with the intent to distribute pornography involving juveniles.

(2) It shall also be a violation of the provision of this Section for a parent, legal guardian, or custodian of a child to consent to the participation of the child in pornography involving juveniles.

[9] §81.1.1. "Sexting"; prohibited acts; penalties

A. (1) No person under the age of seventeen years shall knowingly and voluntarily use a computer or telecommunication device to transmit an indecent visual depiction of himself to another person.

(2) No person under the age of seventeen years shall knowingly possess or transmit an indecent visual depiction that was transmitted by another under the age of seventeen years in violation of the provisions of Paragraph (1) of this Subsection.

[10] §81.3. Computer-aided solicitation of a minor

A. (1) Computer-aided solicitation of a minor is committed when a person seventeen years of age or older knowingly contacts or communicates, through the use of electronic textual communication, with a person who has not yet attained the age of seventeen where there is an age difference of greater than two years, or a person reasonably believed to have not yet attained the age of seventeen and reasonably believed to be at least two years younger, for the purpose of or with the intent to persuade, induce, entice, or coerce the person to engage or participate in sexual conduct or a crime of violence as defined in R.S. 14:2(B), or with

24

On its own, this panoply of criminal statutes is broad enough to adequately shield Louisiana's minors from online predators, as it covers all of the reasonably offensive or threatening conduct that the overbroad §14:91.5 would also bring under its much larger shadow. No one will be any less safe if this Court restrains enforcement of §14:91.5. However, those laws are not the only measures protecting Louisiana's children from sexually inappropriate online contact. Pursuant to La R.S. §15:542, **all** registered sex offenders – not just those convicted of the offenses enumerated in §14:91.5 – are, for the duration of their registration, required to provide the Louisiana State Police "every e-mail address, online screen name, or other online identifiers used by the offender to communicate on the Internet." La R.S. §15:542(C)(1)(m). Registrants are also required to give notice to the police "before any online identifier is used to communicate on the Internet." Ibid. Lastly, most online communities in which minors are likely to be found ban sex offenders outright and prohibit posting of lewd or offensive material. By way of example, Facebook, easily the largest online community in the world and by any interpretation a "social networking site" under §14:91.5, prohibits convicted sex offenders from joining.[11]

---

the intent to engage or participate in sexual conduct in the presence of the person who has not yet attained the age of seventeen, or person reasonably believed to have not yet attained the age of seventeen.

(2) It shall also be a violation of the provisions of this Section when a person seventeen years of age or older knowingly contacts or communicates, through the use of electronic textual communication, with a person who has not yet attained the age of seventeen where there is an age difference of greater than two years, or a person reasonably believed to have not yet attained the age of seventeen and reasonably believed to be at least two years younger, for the purpose of or with the intent to arrange for any third party to engage in any of the conduct proscribed by the provisions of Paragraph (1) of this Subsection.

(3) It shall also be a violation of the provisions of this Section when the contact or communication is initially made through the use of electronic textual communication and subsequent communication is made through the use of any other form of communication.

25

Given the substantial protections afforded Louisiana's minors by the above measures, this Court may safely enjoin enforcement of §14:91.5 without creating additional risk of harm to the state or its citizens.

## III.   <u>CONCLUSION</u>

For the reasons set out above, this Court should issue a declaratory judgment holding La R.S. §14:91.5 unconstitutional.

<div style="margin-left:40%">

Respectfully Submitted,

/s/ Justin Harrison
Justin Harrison (LA 33575)
P.O. Box 56157
New Orleans, Louisiana 70156
(504) 522-0628
*Staff Attorney for the American Civil
Liberties Union Foundation of
Louisiana*

Ron Wilson (#13575), T.A.
701 Poydras St. Ste 4100
New Orleans, LA 70139
(504) 525-4361
*Cooperating Attorney for the American Civil
Liberties Foundation of Louisiana*

*Attorneys for Plaintiff*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 11, 2011, I served this brief on all Defendants via ECF.

<div style="margin-left:40%">

/s/ Justin Harrison
Justin P. Harrison

</div>

---

[11]   See Facebook's <u>Statement of Rights and Responsibilities</u>, "Registration and Account Security," Para. 6: "You will not use Facebook if you are a convicted sex offender." <u>www.facebook.com/terms.php</u>, (last visited July 31, 2011).

Case 3:11-cv-00554-BAJ -SCR   Document 37   10/11/11   Page 26 of 26