UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOHN DOE

VERSUS

BOBBY JINDAL,
ET AL

CIVIL ACTION

NO. 11-554-BAJ-SCR

# OPINION[1]

Plaintiffs, John Doe and James Doe, filed suit against Defendants, James D. Caldwell, Jr., James M. Leblanc, Hillar C. Moore, III, and John Phillip Haney, asserting that Louisiana Revised Statute 14:91.5 ("the Act") is unconstitutional, and they seek declaratory and injunctive relief against its enforcement. A bench trial was held on November 2, 2011.[2] The parties have filed pre-trial briefs (docs. 37 and 38), and post-trial briefs (docs. 48 and 49). Jurisdiction is based on 28 U.S.C. § 1331.

## BACKGROUND

On June 14, 2011, Louisiana Governor Bobby Jindal signed into law LSA-R.S.14:91.5, "Unlawful use or access of social media" (doc. 1, ¶8). The Act took effect on Monday, August 15, 2011 (doc. 1, ¶15). Pursuant to R.S.14:91.5,

---

[1] This Opinion follows a bench trial between the above-captioned parties and serves as the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

[2] On August 19, 2011, this Court issued a ruling (doc. 8) denying Plaintiffs' Motion for a Temporary Restraining Order (doc. 2).

registered sex offenders who were previously convicted of crimes involving minors or juveniles are prohibited from "using or accessing of social networking websites, chat rooms, and peer-to-peer networks." R.S.14:91.5(A)(1). The Act does not define "using" or "accessing," but defines "social networking website," "Chat room," and "Peer-to-peer network" broadly. R.S.14:91.5(c)(1)-(4). Both Plaintiffs in this case are registered sex offenders, and both are subject to the proscriptions of the Act,[3] which reads:

> A. The following shall constitute unlawful use or access of social media:
> (1) The using or accessing of social networking websites, chat rooms, and peer-to-peer networks by a person who is required to register as a sex offender and who was previously convicted of R.S. 14:81 (indecent behavior with juveniles), R.S. 14:81.1 (pornography involving juveniles), R.S. 14:81.3 (computer-aided solicitation of a minor), or R.S. 14:283 (video voyeurism) or was previously convicted of a sex offense as defined in R.S. 15:541 in which the victim of the sex offense was a minor.
> (2) The provisions of this Section shall also apply to any person previously convicted for an offense under the laws of another state, or military, territorial, foreign, tribal, or federal law which is equivalent to the offenses provided for in Paragraph (1) of this Subsection, unless the tribal court or foreign conviction was not obtained with sufficient safeguards for fundamental fairness and due process for the accused as provided by the federal

---

[3] John Doe, a resident of East Baton Rouge Parish, was convicted in 2002 of possessing child pornography in violation of R.S. 14:81.1, a qualifying offense enumerated in the Act. John Doe is neither currently incarcerated nor under post-release supervision. He was not assigned a probation or parole officer upon his release from prison several years ago. (Doc. 1, ¶5).

James Doe, a resident of Iberia Parish, pled guilty in another state to the qualifying charge of having a sexual encounter with a minor. He served his sentence in that state's prison system and, after completing his probation and parole requirements, relocated to Iberia Parish, where he registered as a sex offender. Though his offense had nothing to do with the internet or computers, but he is, nonetheless, subject to the proscriptions of the Act because his offense involved a minor. (Doc. 37, p. 2, n.2).

2

guidelines adopted pursuant to the Adam Walsh Child Protection and Safety Act of 2006.

B. The use or access of social media shall not be considered unlawful for purposes of this Section if the offender has permission to use or access social networking websites, chat rooms, or peer-to-peer networks from his probation or parole officer or the court of original jurisdiction.

C. For purposes of this Section:
(1) "Chat room" means any Internet website through which users have the ability to communicate via text and which allows messages to be visible to all other users or to a designated segment of all other users.
(2) "Minor" means a person under the age of eighteen years.
(3) "Peer-to-peer network" means a connection of computer systems whereby files are shared directly between the systems on a network without the need of a central server.
(4) "Social networking website" means an Internet website that has any of the following capabilities:
(a) Allows users to create web pages or profiles about themselves that are available to the general public or to any other users.
(b) Offers a mechanism for communication among users, such as a forum, chat room, electronic mail, or instant messaging.


D. (1) Whoever commits the crime of unlawful use or access of social media shall, upon a first conviction, be fined not more than ten thousand dollars and shall be imprisoned with hard labor for not more than ten years without benefit of parole, probation, or suspension of sentence.
(2) Whoever commits the crime of unlawful use or access of social media, upon a second or subsequent conviction, shall be fined not more than twenty thousand dollars and shall be imprisoned with hard labor for not less than five years nor more than twenty years without benefit of parole, probation, or suspension of sentence.

Plaintiffs allege that the Act is facially overbroad and unconstitutional in that it significantly infringes on their First Amendment rights, as the Act will not only ban registrants from accessing Facebook and MySpace, but will also "make it a felony for registrants to browse the rest of the Internet" (doc. 1, ¶13). Plaintiffs further allege that, pursuant to the Act, they will be banned from accessing, *inter alia*, NOLA.com, CNN.com, FoxNews.com, ESPN, BBC or Reuters, NYTimes.com, Politico.com, Newsweek, The Economist, National Geographic, YouTube, Getagameplan.org (Louisiana's official hurricane preparedness website), Gmail, Yahoo, Hotmail, AOL, LinkedIn, Monster, USAJOBS.gov (the federal government's employment database), eBay, Zagat, Amazon, because those websites "offer a mechanism for communication among users" in the form of comments and content forwarding (doc. 1, ¶14(a); R.S.14.91.5(C)(3)(b)).[4] Plaintiffs specifically assert that:

> They have web-based email accounts that they are afraid to use. They use internet-based information services to obtain professional information pertinent to their work to obtain safety and technical information pertinent to their work. . . .[for example,] [w]ebsites that would arguably . . . fall within the definition of a social networking website because they contain bulletin-board features and other social networking features. And these are all websites that our clients are afraid to access because of what this law plainly prohibits.

---

[4] At the trial, the Court noted that "this Court's own website would qualify as a prohibited website" (transcript, p. 17:15-16).

4

(Transcript, p. 26:5-17). Plaintiffs further submit that the Act violates the Due Process clause of the Fourteenth Amendment, which protects the public from vague criminal statutes (doc. 37, p. 3).

Defendants assert that Plaintiffs have never attempted to avail themselves of the exemption provision of the Act, which is featured in R.S. 14:91.5(B) (doc. 49, p. 9). That section provides:

> The use or access of social media[5] shall not be considered unlawful for purposes of this Section if the offender has permission to use or access social networking websites, chat rooms, or peer-to-peer networks from his probation or parole officer or the court of original jurisdiction.

Defendants, therefore, argue that Plaintiffs "have no way of knowing whether the Act would pose any of the problems their First Amendment claim is based upon (e.g. prohibiting access to email and safety information)" (doc. 49, p. 9).

Defendants further assert that they have submitted a "Department Regulation" ("the regulation") (doc. 38-2), promulgated by defendant, James M. LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections ("Secretary LeBlanc"), to provide policies and procedures designed to offer "additional guidance about how the Act is intended to operate" (doc. 38-1, p. 1). Therefore, they argue, the Court must consider the regulation in its analysis of the constitutionality of the Act, as "it casts serious doubts on plaintiffs' predictions about the supposedly sweeping scope of the Act's enforcement" (doc. 49, p. 10).

---

[5] The term "social media" is not defined in the Act.

Defendants allege that the regulation "makes clear that the Act is not targeted at the sort of general media websites plaintiffs fear it will reach" (doc. 49, p. 10). Defendants strongly urged the Court to consider the regulation in its analysis of the Act under the framework of the First Amendment.

## ANALYSIS

The issues presently before the Court are: (1) whether the Plaintiffs have standing to challenge the Act; (2) whether the Act is overbroad and, therefore, violates Plaintiffs' First Amendment rights; (3) whether the Act is void and unenforceable because it is unconstitutionally vague; and (4) if the Court finds that the Act violates Plaintiffs' First Amendment rights, whether the Act's constitutional deficiency is cured by the promulgation of a regulation intended to limit construction and applicability of the legislation (transcript; doc 48, pp. 1-2; doc. 49, p. 2).

### I. Plaintiffs' Standing to Challenge the Act

The Court will first consider Defendants' argument that Plaintiffs' challenges to the Act are speculative and premature (transcript, p. 46:13-19; doc. 49, pp. 1-2). Defendants assert that since "no one has attempted to take advantage of the statute as it is written . . ., so it's pure speculation as to what might happen as to John or James Doe" (transcript, p. 21:7-19). Therefore, Defendants contend, it is premature for the Court to consider whether injunctive relief should issue (*Id.* at 23:22). However, Plaintiffs assert that "First Amendment standing requirements are considerably more relaxed if there is a substantial

chilling effect" (*Id.* at 25:11-14). Plaintiffs further assert that their First Amendment rights have been chilled because, as mentioned *supra*, they are afraid to use their personal email accounts and access information websites at work (*Id.* at 26:5-17).

"The requirement that a claimant have standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011). "To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Id.*, at 208-209. The Fifth Circuit has noted that, for a plaintiff to prove an injury in fact sufficient to raise a First Amendment facial challenge, a plaintiff must demonstrate a "serious interest in acting contrary to a statute." *Id.*, at 209.

The Fifth Circuit has also recognized that, although facial challenges are "generally disfavored," there are "concerns in the First Amendment context that are weighty enough to overcome our well-founded reticence regarding facial challenges." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting, *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004)).[6] The Fifth Circuit in *Carmouche* further noted that "the

---

[6] The Supreme Court noted in *Sabri* that it recognizes "the validity of facial attacks alleging overbreadth in relatively few settings, and, generally, on the strength of specific reasons weighty enough to overcome our well-founded reticence." 541 U.S. at 609-10. However, in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), it specifically

First Amendment challenge has unique standing issues because of the chilling effect, [and] self-censorship." *Id.* (quoting, *Dumbrowski v. Pfister*, 380 U.S. 479, 486-87, 85 S.Ct 1116, 14 L.Ed.2d 22 (1965)).[7] Specifically, the Supreme Court

---

recognized the validity of the facial attack alleging overbreadth of a law infringing on the First Amendment right of free speech. *Sabri*, at 609-10.

[7] The Supreme Court in *Dombrowski* observed that:

> A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. For the threat of sanctions may deter almost as potently as the actual application of sanctions. Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser. For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. We have fashioned this exception to the usual rules governing standing, because of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. If the rule were otherwise, the contours of regulation would have to be hammered out case by case-and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.

380 U.S. at 486-87 (internal citations omitted). *See also Virginia v. Am. Bookseller Ass'n.*, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (stating that "the alleged danger of [the

has pronounced that "in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93, 109 S.Ct. 636, 98 L.Ed.2d 782 (1988). Moreover, controlling precedent of the Fifth Circuit establishes that "a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing." *Carmouche*, 449 F.3d at 660.[8]

Accordingly, Plaintiffs, if their interpretation of the statute is correct, must implement significant compliance measures or risk criminal prosecution. Plaintiffs assert that their self-censorship of internet activity in light of the Act has caused a substantial chilling effect on their First Amendment rights. See, *supra* p. 7. The Court, therefore, concludes that Plaintiffs' challenges to the Act are neither premature nor speculative, and, thus, Plaintiffs have standing to pursue their claims.

## II. Plaintiffs' Facial Challenge of Overbreadth

Plaintiffs assert that the Act is "facially overbroad because it criminalizes substantial amounts of protected speech in addition to whatever criminal activity

---

challenged statute] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

[8] The Fifth Circuit in *Carmouche* also observed that for a plaintiff to satisfy standing requirements, self-censorship "must arise from a fear of prosecution that is not imaginary or wholly speculative." *Id.*, at 660.

9

it purports to restrict" (doc. 2-1, p. 6). Plaintiffs further assert that, because key terms are defined imprecisely or not at all, the Act is "unintelligible to the public, unenforceable by police and prosecutors and uninterpretable by the judiciary" (doc. 2-1, p. 3).

The First Amendment prohibits any law that abridges freedom of speech. The Supreme Court has held that "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, ---U.S.----, 130 S.Ct. 1577 at 1587; 176 L.Ed.2d 435 (2010). In the case at hand, all parties agree that the state has a compelling and legitimate interest in keeping sex offenders from websites where minors congregate, and the Court agrees.[9] However, Plaintiffs submit that the Act is facially overbroad because it involves a greater intrusion on Plaintiffs' First Amendment rights than is reasonably necessary in light of the State's legitimate interest in protecting minors. Moreover, at trial, Defendants conceded that the Act, as written, could be "open" to an interpretation that would ban Plaintiffs from access to basic newspaper websites (transcript, pp. 19:22-25, 20:1-17). However, Defendants defend the Act by deferring to the proffered regulation.

The Supreme Court in *Stevens* explained that the "first step in an overbreadth analysis is to construe the challenged statute." 130 S.Ct. at 1588.

---

[9] Defendants assert that they have "an overriding interest—one which plaintiffs concede is legitimate—in keeping registered child predators off of social networking websites altogether," and the Court agrees (doc. 38, p. 2).

Having carefully considered the Act in light of the instruction provided by the Supreme Court in *Stevens,* this Court construes the Act to impose a sweeping ban on many commonly read news and information websites, in addition to social networking websites such as MySpace and Facebook.[10] Additionally, the Court construes the offense as completed once a user accesses the website – whether intentionally or by mistake.[11] The purported definition of "Chat room" is particularly problematic, as it appears to ban an extensive array of websites – including the website for this Court.[12] Therefore, those seeking to comply with the law face confusion as to which websites they are prohibited from accessing.

Provision B of the Act exempts offenders who obtain "permission" to access websites from their "probation or parole officer or the court of original

---

[10]    Including, but not limited to those listed *infra* on p. 3.

[11]    Plaintiffs assert, that:

> Because it's an access restriction, if my client is browsing the internet, he doesn't know if he's reached a prohibited website until he's here. Because, obviously, he has to be given an opportunity to look at the content of the website in order to say, well, hey, this website has publicly visible user profiles, or this website has a mechanism for communication among texts. Or, you know, oh, look, here's a bulletin board. I really shouldn't be here. Well, by that point it's too late. He's already completed the offense, because it's an access restriction. It doesn't require him to post anything to that website. It doesn't require him to engage in conversation with anyone on that website.

(Transcript, pp. 64:24-25, 65:1-14). At trial, Defendants did not contest that the offense would be completed upon access to a prohibited site.

[12]    LSA-R.S. 14:91.5(C)(1) defines "Chat room" as: "any Internet website through which users have the ability to communicate via text and which allows messages to be visible to all other users or to a designated segment of all other users."

11

jurisdiction."[13] However, the Act does not define the standards to be used in evaluating the requests for an exemption. Moreover, the Act does not instruct offenders who are not under supervision how to obtain permission or otherwise avail themselves of the exemption. [14]

The requirement that an offender who is no longer on court supervision following the successful completion of probation or supervisory release return to "the court of original jurisdiction" for an exemption presents fundamental jurisdictional concerns. The Supreme Court has repeatedly instructed that "[I]n origin and design, federal courts are courts of limited jurisdiction; they exercise only the authority conferred on them by Art. III and by congressional enactments pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326 (1986); *see also DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 319 (5th Cir. 2011). "It is to be presumed that a cause lies outside this limited jurisdiction. . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673 (1994); *Del-Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 730 (5th Cir. 2011). A district court may not exercise jurisdiction under Article III, § 2 of the Constitution after a criminal defendant has served the imposed term of imprisonment and corresponding period of supervision, as the

---

[13] See, *supra* n. 3.

[14] Plaintiffs assert that "this whole notion of having to go back and get again and get again permission to look at every new website would create, first of all, a train wreck in terms of enforcement and judicial economy and things like that. But it also doesn't account for our clients' very real First Amendment right to simply receive information and participate in browsing the internet" (transcript, p. 64:6-14).

defendant has "no concrete and continuing injury," and there is no case or controversy. Although it may be the court of original jurisdiction, as mentioned in the exemptions provision, a federal district court would not retain jurisdiction over a criminal defendant once that defendant has completed the sentence of imprisonment and any required supervision. Moreover, a state cannot create jurisdiction for federal courts or for courts in other states. Therefore, no adequate reading of the exemptions clause would render the Act constitutional.

There can be no doubt that the state has a wholly legitimate interest in protecting children from sex offenders online.[15] However, the state's interests "can [only] be served adequately by a narrowly drawn statute tailored precisely toward the conduct the [state] wishes to proscribe." *Hill v. City of Houston*, 789 F.2d 1103, 1113 (5th Cir. 1986). In its current form, the Act is not crafted precisely or narrowly enough - as is required by constitutional standards - to limit the conduct it seeks to proscribe. Accordingly, on its face, and without considering the regulation, the Act is substantially overbroad and, therefore, invalid under the First Amendment.

### III. Void for Vagueness Doctrine

The Court is required to consider whether the Act fails to provide people of ordinary intelligence fair notice of what conduct it prohibits. To avoid the chilling effect a vague law might have on speech, an act is void for vagueness when it

---

[15] Plaintiffs assert that the behavior and crimes which this statute seeks to prevent are already prevented and criminalized by current legislation (transcript, p. 36:1-25).

fails to give persons reasonable notice of what is prohibited. *U.S. v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830 (2008).[16] The Supreme Court has held that:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294 (1972) (internal citations omitted).

As mentioned *supra*, the Act does not clarify which websites are prohibited. As a result, Plaintiffs assert, and the State does not dispute, that they

---

[16] The Supreme Court in *Williams* further noted that:
> Although ordinarily a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others, we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech.

*Williams*, at 304 *quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-495, and nn. 6 and 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

14

have refrained from accessing many websites that would otherwise be permissible for fear that they may unintentionally and unknowingly violate the law. Although the Act contains a section that offers definitions of selected key phrases, such definitions are insufficiently defined, considering the criminal sanctions imposed in the legislation. Accordingly, the Court finds the Act to be unconstitutionally vague and, thus, unenforceable.

## IV. Limiting Instruction

A law is not invalid for overbreadth where it is "possible, applying well-established principles of statutory construction, for us to construe it narrowly so that it does not forbid protected speech."[17] *Hill v. City of Houston*, 789 F.2d 1103, 1112 (5th Cir. 1986). However, the Fifth Circuit has also cautioned that "a federal court may not itself provide a limiting construction of legislation that is not so readily susceptible." *Id.* This Court declines to recognize the promulgated regulation as a cure to the Act's deficiencies.[18] The regulation provides relief to

---

[17] The Court also notes that, if applicable in the present case, a limiting instruction might also cure the claim that the Act is unconstitutional under the void for vagueness doctrine in that it might clarify the proscribed acts.

[18] Defendants argue that since Plaintiffs bring a facial challenge to the act, the Court "must consider any limiting construction that a state court or enforcement agency has proffered." *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (Noting that "[a]dministrative interpretation and implementation of a regulation are, of course, highly relevant for our analysis, for in evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered. Any inadequacy on the face of the guideline would have been more than remedied by the city's narrowing construction."). *See also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, L.Ed.2d 362 (1982) (Noting that "[i]n evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 664 (5th Cir. 2006) (Imposing a limiting construction that construed a statute in a way that saved it from "constitutional infirmity.").

15

only a limited segment of the class of persons otherwise subject to the legislation. The Court notes, and Defendants concede, that the regulation applies only to sex offenders who are under supervision by probation officers of the State of Louisiana (transcript, p. 40:14-19).[19] It provides no relief for offenders who were under supervision in other jurisdictions. Because neither of the Plaintiffs here are under the supervision of the State of Louisiana, the regulation is inapplicable to them. Because the regulation fails to provide any form of relief or protection to these Plaintiffs, it cannot be deemed an adequate cure to the unconstitutional features of the legislation.[20]

---

However, in *Stevens*, the Supreme Court refused to construe ambiguous statutory language to avoid constitutional doubts. 130 S.Ct. at 1591-92:

> Nor can we rely upon the canon of construction that "ambiguous statutory language [should] be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. ----, ----, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009). "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). We " 'will not rewrite a ... law to conform it to constitutional requirements,' " *id.*, at 884-885, 117 S.Ct. 2329 (quoting *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); omission in original), for doing so would constitute a "serious invasion of the legislative domain," *United States v. Treasury Employees*, 513 U.S. 454, 479, n. 26, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne*, 495 U.S., at 121, 110 S.Ct. 1691. To read [the statute at issue] as the Government desires requires rewriting, not just reinterpretation.

[19] At trial, Defendants alleged that "the regulation that was put into effect as of October 12th of 2011 applies, of course, to essentially the people who will be responsible for enforcing this regulation or this act" (transcript, p. 38:17-21).

[20] The regulation is not binding on District Attorneys or the Judiciary.

## CONCLUSION

Although the Act is intended to promote the legitimate and compelling state interest of protecting minors from internet predators, the near total ban on internet access imposed by the Act unreasonably restricts many ordinary activities that have become important to everyday life in today's world. The sweeping restrictions on the use of the internet for purposes completely unrelated to the activities sought to be banned by the Act impose severe and unwarranted restraints on constitutionally protected speech. More focused restrictions that are narrowly tailored to address the specific conduct sought to be proscribed should be pursued.

For all of the foregoing reasons, the Court concludes that the Act is unconstitutionally overbroad and void for vagueness, and judgment shall issue in favor of Plaintiffs and against Defendants, enjoining enforcement of the Act.

**IT IS ORDERED** that, within ten days of the issuance of this Opinion, the parties shall submit a joint proposed judgment that accords with this Opinion.

Baton Rouge, Louisiana, February 16, 2012.

BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA